Case number 14-7193, et al. Susan Weinstein, individually as co-administrator of the estate of Ira William Weinstein and as National Guardian of Plaintiff David Weinstein, minor, et al. appellant v. Islamic Republic of Iran, et al. Mr. Capps for the appellant, Mr. Francisco for the accolades. Mr. Capps. Good morning, Mayor Capps on behalf of Plaintiff's appellants. My clients are victims of terrorism. Suffered mightily at the hands of Iran, Syria, and North Korea. And for that, received judgments in excess of an approximately $250 million in compensatory damages cumulatively. $1.75 billion punitive damages. Haven't been able to collect anything. The governments of Iran, North Korea, and Syria, that's incorrect. They haven't been able to collect materially anything. They've collected some small amounts. The governments of Iran, North Korea, and Syria haven't paid and they're not going to pay. They've made it very clear. Congress tried to address this problem through four separate enactments culminating in 28 U.S.C. 1610G to enable victims of terrorism to go through the legal process, through a process driven by attorneys and through the court system to find assets that others haven't found and try to collect the limited assets of Iran, North Korea, and Syria that exist in the United States. The Internet is run by and through ICANN, at least at the root zone level, the highest level of the Internet. Iran, North Korea, and Syria have Internet assets. They have country code at the top level of the main name and IP addresses that, again, are operated by and through ICANN in California and in D.C. So the clients attempted to attach those assets. They did attach those assets in the District of Columbia through writ of attachment using the process supplied by D.C. statute. And the court below quashed that writ of attachment, not allowing any discovery, not allowing us to submit any substantive arguments at all. We requested additional time by motion following discovery. And the district court didn't allow that, finding that it could reach the questions on threshold questions of law under D.C. law. That was an abuse of discretion on two levels. First of all, in the supply of D.C. law and in reliance on the misapplication of D.C. law, that formed the basis of its decision to deny discovery. And secondly, it didn't even reach the question of the IP addresses at all. It simply didn't address them. That's not the fault of the district court, certainly. ICANN didn't raise the issues. And because we didn't get the opportunity to provide substantive briefing in response, the district court apparently wasn't even aware that the IP addresses were attached. But nevertheless, it was an abuse of discretion not to allow discovery on that question without even addressing the issue, without reaching substantive points of law. Instead, it applied Virginia law, a peculiar statute that relies on the existence of liabilities, quote-unquote liabilities, between the guardianship and the judgment debtor. The liability requirement does not exist under D.C. law. And what the court in Umbro held, that the district court applied, the court in Umbro held that because a domain name is not a liability owed to the judgment debtor, that non-liability can't be attached because, again, the Virginia statute requires the existence of a liability. Umbro did not reach the question of whether domain names are property. It addressed it. It acknowledged that one of the parties believed that it was property. It didn't reach the question, as toaccounts.com, the 28-J case that we sent you recently, CRS recovering sprinkler warehouse saw make clear, among other cases. Umbro is an outlier. It's not persuasive. Even if it weren't an outlier, an outlier is probably too weak. It's the only case, except for a couple that rely on Umbro. That reached this question and decided it in the manner that Umbro did. It's not persuasive. And it's not relevant to CCTLTLDs because country court top-level domain names, unlike secondary to second-level domain names, are not involved, do not receive services at any substantial level, beyond the de minimis services that ICANN provides in changing or directing the change to the root zone code one time. Excuse me. And because of that, because the top-level domain names are not recipients of services on a regular basis, the analysis in Umbro, relevant to the provision of services that the top-level domain name gives to the secondary domain name, which, again, isn't applicable here at that higher level, the analysis doesn't apply at all. Moreover, regarding the question of the provision of services that ICANN relies so heavily on, it's a mistake because properties attach on a regular basis. Without regard to the weather, there's a provision of services. Without regard to the question of services that animated Umbro so much and ICANN's briefing, for example, apartment buildings, co-ops, any leasehold. These are all, not every leasehold, but many leaseholds. Property with an easement on it. These are all examples of real property that, maybe not in the hands of a garnishee, but certainly when you're going after the judgment debtor, are certainly attachable. There's a provision of services very often. There are limitations on the use of property. Nevertheless, it's attachable. It's attachable subject to the limitations, certainly. But the existence of limitations is not a reason not to allow attachment. D.C. statute entitles the judgment creditors to discovery. It's a provision in the code. We're entitled to deposition. We're entitled to interrogatories. We submitted interrogatories.     we submitted interrogatories. ICANN responded with one word, essentially, we had no information about any relevance. We didn't submit a decision, not that we directly demanded that they do so. Instead, we requested significant discovery beyond just deposing ICANN. Deposing third parties explained at great length. And the district court, again, did not allow it. Reaching these issues on this record would do great injustice. It would do great injustice to my clients, first of all. It would do great injustice to the top-level domain name managers around the world who aren't represented here. Who are being told by ICANN that their property is not property. Property that is similar property that has been sold in one instance for $107 million, referring to the columbia.co domain name, which is referenced in the appendix. It was a sale of that asset for $107 million. Other assets that have similarly been transferred, the details of which are not exactly reflected in the record, and again, that's because there's been no discovery. Can I ask you, assuming that they are property, I have two questions about D.C. law, which are actually questions generally about the common law of attachment. So one requirement is that the creditor can't obtain more rights in the property than the debtor. Right? Than the judgment debtor. That's what we said in Heiser. Right? You have to say yes or no. Yes. And secondly, that the garnishee has to be, has to have the property in its hands. It has to be in possession of the property. Correct. Both of those are correct. Generally, yes. Well, that's what the D.C. statute specifically talks about in the hands of and talks about possession. Yes, but it's talking about physical property mostly. At that particular statute you're referring to. It has to be in possession of something. Okay. I mean, when you're talking about intangible property, it's obviously legal fiction. And so to talk about it in that sense is a little bit challenging, but okay. So my question, I just want to understand exactly what we're talking about here. So I read your attachment letter. You want the CCTLD, I'm going to just talk about Iran, just because it's easier, of Iran. And you want to get, that's one thing. The government of Iran's IP address and the ministry's IP address. Those are the three things. The way in which you would get the CCTLD of Iran is by updating an entry in the root zone directory. Is that right? Correct. So starting with that one, does Iran have the power to require ICANN to make that change? Does Iran have the power? Yeah, because they're the judgment debtor, right? Yes. So since you can't get any more power than the judgment debtor has, could Iran make ICANN make that change? I'll respond directly, but first I think that's a misstatement of the law. Okay. We can't take more interest than Iran has. But that doesn't mean that we can't do things that Iran can't do. Because that's, the rules say, the Heiser, for example, says that, again, you can't attach more than the judgment debtor has. But that doesn't mean that through the legal process, through court order, we can't do things that Iran by itself wouldn't be able to do. There's a decision by this court, Washington Loan and Trust, 1902, I think, at the end of our reply brief, which says that, it's talking about a safe deposit box. But there's two keys, obviously. The bank has one key, and the owner of the box has another key. The court is grappling with this issue, because the judgment debtor, whose property is being attached, only has one of the keys. The judgment debtor by himself can't open the box. And the court says that's irrelevant. It would be very strange to look at law that way. The judgment debtor, in that case, the holder of the safe deposit box, has the power to require the bank to open a safe deposit box. If I get a safe deposit box, I get a key. Obviously, the bank gets a key. And by my contract with the bank, they've got to open it when I want it open, right? There are limitations. I mean, it's 3 in the morning, they can't demand it. But at some point, the bank has to be willing to open it. Does Iran have that authority over ICANN? Let's say Iran wanted to. I believe the answer is yes. And in what way? First of all, this is a record issue. The record is not developed. We haven't had the opportunity to develop it. It's extremely important to answer this question. I don't think the court can or should reach this issue. Iran owns this property. It belongs to Iran. It was developed by John Postel. The process by which it transferred is not developed by anyone, I don't think. I'm assuming that for the purposes of this argument. If Iran says, I want to transfer my .ir to, I don't know, Korea or something, does anything require ICANN to do that? There are limitations. I mean, if they want to transfer it to Korea, that would be difficult because the .ir is obviously intended for the people of Iran. So giving it to Korea would create problems. Giving it to somebody who doesn't have the ability to manage it, doesn't have the technical skills to be able to manage a property would be a problem. And those limitations need to be abided by. But beyond that, it's not ICANN's role to say yes or no if it belongs to Iran. ICANN is not Congress. ICANN doesn't create law. Could Iran sue ICANN if ICANN refuses to do this and force them to allow the change to a different... I don't know. I don't see why not. Yes. Okay. And now, does ICANN have possession of the ccTLDs? Does ICANN have possession? Again, we're talking about an intangible asset. I understand that, but the statute... You said that several times. Intangible assets can be possessed. Yes, but... It doesn't follow. If you call it intangible, you can't possess it. I mean, one of the prime examples is a trade secret. Would you say the company that's manufacturing a particular product in accordance with their trade secrets doesn't possess the trade secret? Of course they do, Your Honor. They own the trade secret. The word possess has connotations that don't apply to an intangible asset. But certainly, and for the purposes that we're talking, absolutely, a trade secret is owned and possessed by the party that created it. You had your question again, Judge Rutland. I thought that the ccTLDs had been delegated to the registry managers. That's the process by which ICANN gave them out. But again, ICANN created them for a specific purpose. It was to benefit Iran and its subjects. ICANN describes the process by which it gives ccTLDs out and takes them away and gives them to other people as delegation, suggesting that it's done entirely on a discretionary basis. But that's ICANN's nomenclature. That has nothing to do with the way that the law ought to look at ccTLDs. You talk about reclaiming them. I just wonder, what does that mean? Reclaiming them on behalf of Iran? Is that your question? That ICANN can reclaim them from Iran. Oh, that's the IP addresses we're talking about. Okay. So how was it going to... I see. They didn't have to update the entry in the root zone directory. That's what you said. Correct. That's all that would happen. And who has the root zone directory? It's currently in the hands of Verisign. So why shouldn't this case be brought against Verisign in Virginia rather than against ICANN in Washington? That's a good question. ICANN is in charge. Verisign is essentially a custodian. I don't believe that they have any discretionary role whatsoever. They're hired to do what they're told to do by ICANN. So it's not... For example, if you have a security company that's watching a vacation home in North Carolina, let's say, I'm not there the whole year. The security company doesn't own the house. Either. They're custodian over the asset in terms of, again, making specific changes to it. But it belongs to the federal government ultimately. It's in the possession of ICANN under the control of ICANN. So if it belongs to the federal government, can Iran really make it do anything? Can Iran make the federal government do anything? Our federal government, yeah. That is, if Iran wanted to change the root zone directory to make a sale like you're talking about, you couldn't make our federal government do anything. The CCTLV belongs to Iran. The root zone belongs to the federal government. The root zone... But it would have to make a change in the root zone in order to get what you want, right? That's correct. I mean... It's an interesting problem. If you assume that the federal government has the right to say, we're not doing anything. This is our property. We're doing nothing with it. It would shut the internet down. They certainly don't assert that right. They never have it. They have no role. Each of you assume the opposite of what actually turns out to be a useful position for you. If you take the position that it's owned by the United States, then Iran can't make it do anything. If they take the positions not owned by anybody, then maybe Iran can. So I'm a little not wanting to resolve that question for the very reasons that you presented in your brief. I'm trying to assume that you are correct about it, and in that case I'm having trouble figuring out exactly  CCTLV. The asset is controlled again by Iran. It's not controlled by Iran. It's controlled by ICANN. And because it's controlled by ICANN, under the auspices of ICANN, ICANN has the authority, the government gave it the authority to make changes to it. I don't know that the government is certainly given the government's position. I don't know that the government's interest in the root zone plays any role here. Again, because the government has taken the position that it has no role to play. I think that the government taking that position explicitly before this court ought to play a significant role in that discussion. Let's suppose you win. What do you do with the top-level dot IR? What do you do? We would either license it or sell it to a party that has the ability, recognized by ICANN ideally, ideally somebody that's already administering the top-level domain name, and there are plenty of private companies that do that, to then operate the dot IR on some kind of, well, if it's a license on some kind of royalty basis. What happens to all the holders of the secondary domain names? Absolutely nothing. They would not notice any change at all. It would be a seamless transition. The only difference is when they want to pay at the end of the year to renew their second-level domain name, they would pay a different address. That would be the only difference. The transition would have to be seamless. It would hopefully disrupt the internet, and that's not our goal, certainly. That's not what would happen. We would make sure that it would be a seamless transition to whoever we licensed or sold it to. The second-level domain names would operate again without any interruption at all. As long as the root zone is adjusted as it would have to be according to court order in a timely way, instead of directing traffic to address A, it would direct it to address B, and everything else would operate as before. You know, I can understand if the top-level domain name was something like TV, and that was that Tuvalu island chain that did something. I'm not sure it's a sale or a lease or whatever, but what value is there in IR other than designating Iran? Well, if you're Iranian, it's high value. People want to have for whatever reason, somebody gets a .IR domain name. They want to have association with that nationality. That's what .IR represents. But I think the question ultimately gets to marketability. And if the question is, this asset isn't worth very much, so be it. If that's what the market will bear, that's what the market will bear, and that's the amount that we'll recover. We're not going to recover more than the asset's worth, but we certainly want that amount, whatever it is. And I think we're entitled to it. Can I ask you the same question now about the IP addresses? Were they not already allocated to the regional registries, and then from there down to the ISPs and to Iran? The answer is yes, and that's the only question I think the record can establish. Everything else about this is very fuzzy because there is no record. The reason that I think it's not a problem, first of all, when you're talking about large blocks of addresses, which is what happens with a country like Iran with a massive military program and a massive internet program in presence, the assets are allocated from the intermediate registry, the regional registry to Iran in enormous blocks. If the block that the registry received from ICANN is undivided and transfers in kind to Iran, the path from ICANN to Iran is very straightforward. At no point is the registry really getting involved in the asset. That's one. Getting involved in dividing up the asset, getting involved in the allocation of the asset because... I'm sorry. I'm further coughing. The IP addresses now are reallocated to individual machines and individual users. That's done by Iran. But you want them back. We will. How would you get them back? In other words, this again goes to the question I was asking before. They're not in the possession of ICANN. They would have to somehow be reclaimed from ICANN. Is that right? That's point two. ICANN is in control of these things from the very beginning. Even the addresses that are allocated, it's individually. The registries don't actually do that. An internet service provider, for example, Verizon, will give out a single IP address to where it needs to go. Maybe. Again, that's not established on the record. The asset is nevertheless controlled by ICANN in the sense that in order to operate, it needs to be centralized. It wouldn't work if it wasn't centralized. What is it that ICANN would have to do? If you were to succeed in attaching the IP addresses, what would you want ICANN to do about it? Cause the IP address to be assigned to a different machine. How does it do that? What does it have to change in order to do that? That's a technical question I personally don't even know the answer to. I guess the question is how does it fit within the attachment statute which talks about the asset being in the hands of, credit being in the hands of, possession, all those kind of words. It's in the hands of ICANN in the sense that ICANN controls it. ICANN has control over these assets. You talk about sort of reclaiming them and I'm unsure what you mean by that. It was probably a poor word choice. It actually metaphorically sounds like I can understand it. In the context, that's what we were... I thought the IP addresses were distributed in a block to equipment manufacturers. Is that wrong? I believe that's wrong. It's assigned at the local level so to speak. By an internet service provider or by a country. If I go out and buy a laptop it already has an IP address on it. I don't believe that's true. It has 192.168 which is a local address but that address is not... It's local to your home network. It's not an address that was assigned by the manufacturer. Are there no further questions? Thank you, Your Honor. Chief Judge Garland, may it please the court. Noel Francisco for ICANN. Chief Judge Garland, I'd like to first address your question about Iran's authority in this area and then Judge Randolph, I'd like to address your question about what would happen to the second level domain names because I think they go to the critical issues in this case which is whether or not these country code top level domain names are attachable property. I think that's the easiest way to resolve this without getting into the more esoteric questions as to whether they're property in some sense even if you assume there's some sort of property. So you want to skip the grounds on which the district court decided the case? No, Your Honor, because I think the district court didn't address whether they're property. He was quite clear that he wasn't addressing that question. He held that they weren't attachable property. Here there are three basic principles of DC attachment law that each independently foreclose the attempt to attach the CCTLDs. The first, Chief Judge Garland, is the one that you put your finger on when you asked what Iran's ability was to force ICANN to transfer a CCTLD from one manager to another. And the answer is all Iran has the ability to do is make a request the same way you could make a request or the same way I could make a request. That is not anything the district court said, though. No, Your Honor, that was not the basis upon which the district court resolved this decision, but it is a basis upon which you can affirm the district court below. If we're satisfied that the facts are as you put them rather than as the facts are as your opposing counsel puts it. Well, no, Your Honor, because on this issue there's not even a factual dispute. They've never disputed the fact that it's ultimately I thought he was disputing it when I asked him. Well, but if you look at what they actually sought discovery on, they never sought discovery on any of this. I think if you look at page 17 of the blue brief, they talk about what they want discovery on. They want discovery on ICANN's assertion that the attached internet assets are not property. I'm assuming for the sake of argument that they are in some sense property. And they want discovery on whether ICANN is unable to transfer the assets. So they're not questioning that ICANN plays a role. They're simply questioning whether ICANN has the sole authority or whether ICANN can only do it with the concurrence of the Department of Commerce. If the question is whether they've conceded this, I'm going to ask him afterwards. Sure, Your Honor, but they certainly have not sought discovery on that. And on that question it's quite clear that the transfer of a CCTLD from one manager to another is a multi-stakeholder process in which ICANN and the Department of Commerce have separate and independent roles. And they don't dispute that basic fundamental point. That's what underscores how what the plaintiffs are trying to get here is greater power in the underlying CCTLDs than Iran, Syria, and North Korea have. If Iran, Syria, and North Korea have no ability to transfer the CCTLD from one manager to another, then it's an inappropriate use of the garnishment process to force the very type of transfer that the purported owners of the property couldn't do themselves. I'd also like to turn to the issue upon which the district court did resolve this case because I think you... So there are three principles of attachment law? Yes. Before we get to the district courts, what's the other one? Sure, so the first principle of attachment law that we were just discussing was that the judgment creditor can't get any more power than the judgment second. Excuse me? And the second? The second is the one that the district court relied upon. Can we skip to the third? Sure. The third one is that goods and chattels are limited to tangible, personal property. So the one I was asking about, that it has to be in the hands of, is not one of your three? No, that also... If you assume esoterically... I had a fourth. If you assume esoterically that this is property in some sense, neither the CCTLDs nor the underlying IP addresses, I would say, are being currently in ICANN's possession. They have certain abilities over CCTLDs, certain roles in the transfer from one to another. They don't have that same role with respect to the IP addresses, but I don't think in either way could you say that they're in their hands. Alright, I interrupted you. You have two other... Sure. So I would like to defend the basis upon the judgment below, because I think it was absolutely correct. And that's the first principle, that you cannot use garnishment law to insert yourself into the middle of an ongoing relationship to provide services. Here, what plaintiffs effectively want to do is to force Internet users in Iran, Syria, and North Korea to purchase Internet services from either them or their designee. To give an example, suppose I had a contract with the government of Iran where I paid them money in order to provide me with legal services. What plaintiffs are effectively trying to do is step into Iran's shoes and force me to purchase legal services from them. Well, that is simply an inappropriate use of garnishment law. The problem that I have with the District Court's opinion is that it's based on the Umbro case. And the Umbro case only resolves the question of second-level domains. And it says that you can't attach second-level domains. That seems to me very unlikely to be D.C. law. I think that it's based not just on the Umbro case. It's also based on the general principle as I agree that at least as far as D.C., it's unlikely that D.C. would say that, I don't know, porno.com, which you can imagine what they do. And they owe a lot of money to extraporno.com, and they don't pay. And Extraporno would be able to attach them, just like in California they're able to attach, and in Minnesota they're able to attach. Doesn't that seem likely in the development now? I don't know, Your Honor, but that's clearly distinguishable. Because I can take the porno.com, say I have the right to control the porno.com second-level domain name. I have no obligation to actually use it. Say I'm a member of the Christian Right, and I don't want it to be used. I can purchase it, stick it on a shelf, and let it collect dust. The same is not true when it comes to a top-level domain name. The sole function of assigning a manager to a top-level domain name is to pose upon them the duty to operate that name. And that's why, with respect to top-level domain names, the underlying property, assuming for the sake of argument that we're going to call it property, is completely inseparable from the duty to operate the ccTLD. And plaintiffs are quite candid in what they want. They want to either be able to operate it themselves or, as counsel just explained, license it to somebody else to operate it. So, in other words, they're trying to force Internet users in these countries to purchase a bundle of services from either them or their designee. It's not just Umbro that makes clear why that's inappropriate. It's also cases like Cummings General Tire and Shifrits, D.C. Court of Appeals cases. I'm not going to tell you that those cases are squarely on all fours. They're not. But they stand for the basic proposition that when you've got an ongoing relationship to provide services, garnishment isn't an appropriate way to do that in order to essentially attach the payments that flow from the use of those services. And under certification law, you don't need a D.C. case on all fours in order for this court to resolve it. You just need a discernible path to resolution. Here, I would submit that those cases, along with Umbro, which stands for the same basic principle, you might disagree with how they apply the principle and the facts of Umbro, but the basic principle is the same principle as in Cummings and Shifrits. That provides a discernible path to resolution, and again, it's not an issue upon which plaintiffs have sought discovery in this case. The third basis is the cleanest legal basis to resolve this, and there's absolutely no question on anybody's part as to whether discovery is necessary. And that's the meaning of the phrase goods and chattels in the D.C. attachment law. As this court held in the Heiser case, when it comes to interpreting garnishment statutes, D.C. applies the district construction rule. That means you have to adopt the narrowest reasonable interpretation of the words in order to safeguard the rights of innocent third-party garnishees like ICANN. And in the Parsons case... The case that Heiser is talking about is a due process case. It's about the due process provided to the garnishee. It's not about what is the subject of garnishment. And as I read the D.C. cases, they are... I'm just going to try to find the... Roe says goods and chattels mean all categories of property and all rights and interests in property. That is as broad as it can be. Well, I disagree with that reading of Roe, Your Honor. Roe involved the execution of a judgment in a municipal court. The specific statute that applied to the execution of a judgment in a municipal court did not use the phrase goods and chattels. It is true that there's some dicta in Roe that separately discusses a different statute that wasn't applicable in that case. All that means is that there isn't a case directly on point, but as you told me a few minutes ago, all we have to do is be able to discern the path. And the Court of Appeals there is pretty much explaining the path, which is that we're no longer... There's a long discussion about this. We're no longer going to distinguish between law and equity. We're no longer going to distinguish between tangible and intangible. We're going to... We're going to have to have a very clear understanding of the different kinds of property. Except, Your Honor, that much more recent D.C. case law makes a much clearer, discernible path. And that's the strict construction rule. In Heiser, they were citing D.C. Court of Appeals case law that stands for the basic proposition that's widely accepted in other courts as well, that when you interpret garnishment statutes, you need to construe them narrowly in order to safeguard the property. Yes, Your Honor, exactly. And then when you combine that with the D.C. Court of Appeals' far more recent decision in Parsons, Parsons, which involved trusts and estates, made crystal clear that one common definition of goods and chattels is limited to tangible personal property. Yeah, but I'm sorry, but that's one, if I'm correct about that, that's one where you take the context of the will, and you make that it could be read either way, but the more common way is it covers everything. And in the context of that case and that will, they said that they were going to read it narrowly, but that's not... Well, the will didn't actually use the phrase goods and chattels. They were discussing the phrase goods and chattels and explaining how one common understanding of the phrase goods and chattels was limited to... Normally, a bequest of personal property includes every form of personal property from whatever source it may be derived. The context may show that it's limited to tangible. And in the context of this will, they decided it was. Yeah, but if you continue that sentence, Your Honor, it would limit it to tangible personal property, which is one definition of goods and chattels. Yes, one meaning of, right, but there are other meanings. Look, I would concede that there are different definitions of goods and chattels when you look out at the various sources. So how would you say it's limited? What do you think goods and chattels means? Sure. What it means is tangible personal property when... Only tangible? Yes, Your Honor, when you construe it in light of the strict construction rule. Because the strict construction rule requires you to adopt the narrower construction. So, company rights can't be attached... Not under the D.C. attachment law limited to goods, chattels, and credits. So, for example, it also includes the word credits. If goods and chattels does actually include all intangible property, the term credits would be completely superfluous. So, let me even assume for the sake of argument that there's some category of intangible property that gets swept into the phrase goods and chattels. It certainly doesn't include the most esoteric form you could imagine, this thing that we call a CCTLD. Just to be clear, so you are saying second level domain names can't be attached in the District of Columbia. That's your view? Not as a good, chattel, or credit. That's true. Then how? Your Honor, there may be... I think you're probably right that they can't be attached. That doesn't mean they're not property. That doesn't mean they're not subject to conversion. That doesn't mean they're not subject to everything else. But when you take a statutory phrase, like goods, chattels, and credits, combine it with a strict construction rule, and a clear, recent D.C. Court of Appeals decision stating that one common understanding of that term is limited to tangible personal property, that's the construction you should apply. And I would submit that the fact that it can be broader in the trusts and estates context actually helps us. What the case law makes clear in D.C. is that when you're interpreting a will, you interpret language broadly to avoid... So just to be clear about what we said in Heiser is this court has construed strictly against the garnisher a statute in derogation of the common law. Not that we're just going to strictly... that the Court of Appeals was going to strictly construct, but only if it's in derogation of the common law. And if you look at the case law underlying that, it makes clear that the purpose of strictly construing it is in order to safeguard the rights of innocent third-party garnishees like I can. But at the end of the day... Look, and that's the Austin case, and the Austin case, as I said, had to do with due process for the garnishee. Didn't have to do with the kind of property of the garnishee. And it said the common law, you have a right to notice. And in Austin, they weren't giving the garnishee any notice. And so that was in derogation of the common law. But it doesn't appear to be the common law that intangibles can't be attached. Your Honor, the common law rules, I think, were broader than the statutory rules. When you switched from a garnishment proceeding from common law to statutory, you then imposed upon the courts the obligation to construe that statutory language. And I would submit, it needs to be construed narrowly. But get the words that I just quoted correctly. We're going to strictly construe where it's in derogation of the common law. That is what it says. It doesn't say we're going to strictly construe. And I don't think there's any common law rule that allowed the attachment of all intangible property. If there were a common law rule that allowed the attachment of all intangible property and goods and channels included all intangible property, why on earth would you have the separate listing for the word credits? Goods and channels would have already encompassed credits. Why does any of this turn on D.C. law? Your Honor, it turns on D.C. law if you want to avoid what I consider to be the slightly more difficult questions as to whether this is property that is owned by these defending countries and hence... But don't we have to decide that question in light of the foreign sovereign immunities law? You don't have to, Your Honor. That's what this Court held in the Chalabi decision where it made clear that you could bypass a difficult statutory jurisdictional issue under FISA in order to reach the merits and it distinguished the statutory jurisdiction issue from the Article III jurisdiction. So you assume that the I.R. is property under FISA, right? Yes. But the question you're addressing is whether it's attachable. Whether it's attachable property under D.C. law. And that turns on D.C. law? Yes, Your Honor. Rather than federal common law? I think that under the federal rules it turns on D.C. law rather than federal common law and I think there are, in addition to Judge Garland, to the issue we've been talking about I think there are two other issues that don't require you to accept my understanding of goods and channels in order to conclude that this is not attachable property under D.C. law. Both the principle really three principles. Both the principle that you can't use garnishment law to insert yourself into the middle of an ongoing relationship to provide services that the judgment creditor can't attempt to seize greater rights than the judgment debtor itself has and the rule that the property actually has to be in the hands of the judgment creditor in order to be subject to garnishment. There was no argument in the briefing here about the terrorism insurance provision on blocked assets was that argued below? There was certainly argument by us below an argument by us in our briefing we've made clear from the very beginning that that was an issue in this case yet the plaintiffs deliberately decided not to address it either in the court and this is where I must take issue with one of the statements of my brethren here. They had every opportunity to address these issues they obtained a six week extension to their opposition to our motion to quash and had full opportunity to address these issues if they wanted and they chose not to instead they chose to at the last minute file a two page non-sensitive so called preliminary response. When we got to this court you may recall that during the briefing on whether the issues should be certified to the D.C. Court of Appeals we made clear in our briefing there too that we were going to raise these issues. We said it and yet again in their opening brief they chose to remain silent so one very simple way to resolve this issue would be on one of the D.C. attachment law questions. Another very simple way to resolve this issue would be to say that they forfeited any arguments that this court has jurisdiction under FISA and I don't think it requires you to address the form your questions as to whether in some sense CCTLD's are property and therefore we would urge the court to affirm the judgment below on one of those issues. The statute in FISA 1609 which is about attachment says the property of the United States of a foreign state shall be immune from attachment arrest and execution except as provided in 1610 and 1611. Does that suggest that that is the only way to achieve attachment and we don't look at state law? Yes. I think it suggests that you look to state law unless there's a federal statute that governs No, no, no, I'm talking about the Foreign Sovereign Immunity Statute. Oh, I'm sorry, Your Honor. Subject to, this is section 1609. Okay. Subject to existing international agreements, the property in the United States of a foreign state shall be immune from attachment and execution except as provided in section 1610 and 1611. And those are the exceptions, the attachment exceptions. Yeah. I think those provisions go to whether this court has jurisdiction over the statutory jurisdiction over the attachment proceeding in the first place. And once you satisfy it, once you make that determination, then you look to local law to determine whether it nonetheless is attachable. Once the court has determined that the property is  to determine whether it is attachability under local law. Well, if that's the case, then does that have to be decided first? No, Your Honor, because that's what this court held in Chalabi and also made clear in the Kramer against Gates case. Chalabi, I can give you the cites, 543 F3rd 725, Kramer 481 F3rd 791. What Chalabi squarely holds is that you can bypass FISA statutory jurisdictional question. Judge Randolph, you're on the panel on that case, I believe. You can bypass a statutory jurisdictional question, and it particularly involved FISA in order to address the merits. And it distinguished it from the Steel Company Article 3 line of cases. It basically said Steel Company acknowledged that when you were talking about a statute as opposed to Article 3 jurisdiction, you didn't have to address it as a threshold matter, which is why we would urge the court to resolve this. Look, we're perfectly happy if you want to resolve it in our favor on the FISA and TRIA issues as well. And see which way I was going to resolve it. But I think the easier way to resolve this case would be under D.C. attachment law or to simply recognize that they have forfeited the FISA and TRIA questions. I'm happy to answer any further questions Your Honors have. We don't appear to have any. Thank you. Thank you. Thank you. Does Ms. Appellant have any time? We'll give a couple minutes. Thank you, Your Honor. On the issue of discovery, it's impossible to go through the entire list of things that we asked for, but I refer to the court for a motion to discovery on 31 of the appendix and the exhibits there too. The Cyrus Declaration on 36 of the appendix and the Gelbin Declaration on 49 of the appendix and all of the exhibits and attachments. There's a very long list of things. The brief only offers a very brief summary of what we asked for in discovery, and I certainly think that it reaches the issues that counsel was talking about a second ago. Regarding goods, channels, and credits, that phrase was codified in the D.C. Code in 1902. It goes back at least to the 1700s. It's a very old phrase. Goods, channels, and credits, all three words together. My research suggests it might go back farther than that, probably to the late Middle Ages. I haven't been able to exactly trace it down and that's why it doesn't appear in the briefs. But it's a very, very old phrase that has been reinterpreted in modern eras as Roe v. Coppola makes clear. That it's going to apply to intangible assets, although that was true before Roe v. Coppola also. I should point out that Roe v. Coppola was decided by this court before the D.C. Court of Appeals existed. And I believe that it's binding precedent on the D.C. Court of Appeals. The D.C. Court of Appeals is free to overrule it. When the D.C. Court of Appeals was founded in 1970, this court's precedent became that court's precedent, I believe. We do not seek to force the Iranian citizens or anyone else with a .IR domain name to buy anything from us. That's simply not true. We simply seek ownership of the .IR domain name. People who wish to leave the .IR domain name because they don't like the new purchasers are certainly free to do so. There's not discretion on our part, like an attorney, their example. Roe v. Coppola is discussed as an attorney license. Can obviously reflects my ignorance about this. Can someone in Iran use a different entry code? They can certainly use a generic type of domain name. They can become a .com. Whether they can use a .sy, I don't know. I mean, Iran obviously is different than the United States in terms of its law. I could buy a .IR domain name. The fact that I'm in America doesn't prevent me from doing so. I would assume that's true in Iran also, but of course Iran's processes are different. Let me just say very briefly regarding FISA. I agree that the court needs to reach FISA. I think the court cannot resolve this without reaching FISA and I think the court can't do so without discovery. There are a lot of issues relating to whether disasters are property of that the court cannot reach and certainly cannot reach justly in a way that would be just to the CCTLD domain name. Can you say why we need to reach? It's a jurisdictional issue. The sovereign immunity issue. Right. It's a jurisdictional issue and it gets to foreign relations. I think the court would, I think it would not be wise or consistent with prudential concerns. Just simply ignore it. Fine. And the reason that you didn't raise it? Below. That's what they say. The reason we didn't raise it below is because we had no time. Regarding the 60th discovery period, it's simply not true. The processes below are discussed in a reply brief at length. I just want to point out that the writs were sent to ICANN on June 6th. ICANN took until July 28th to respond, 35 days later. We moved to compel discovery on August 11th. ICANN finally produced documents trying to make that motion go away on September 19th, more than a month later. We moved to compel discovery four business days, three business days after those documents were produced. We weren't sitting on our rights. We were being diligent. Most of the delay below was in the hands of ICANN. We did everything that we could to move things along in a way that was amicable. And we requested from, again, the District Court the ability to respond fully on the merits after discovery. We expected if the District Court was going to say no, it would give us the opportunity to file a merits response and did not do so. Again, on very narrow legal grounds that I think were mistaken, and from Judge Garland's questions, I think that the Court agrees. And we would like to be able to go back and do this properly and create a record so that the Court can review these questions properly when this case comes back. Thank you. Other questions? All right. We'll take the matter under submission. Thank you. We'll take the matter under submission. Thank you.
judges: Garland, Henderson, Randolph